
**WILLIAMS v. MITCHELL.**

No. 14460.

Court of Civil Appeals of Texas. Dallas.
Feb. 15, 1952.

Rehearing Denied March 14, 1952.

Bond & Crofts, Terrell, for appellant.

Barnes & Barnes, Terrell, for appellee.

YOUNG, Justice.

The suit was in trespass to try title, predicated upon a parol gift of real property (south half of Lot 4, Block 47, Terrell) made to plaintiff by Henrietta Tate during the latter's lifetime, and continues possession thereafter, together with valuable improvements made in good faith. Defendant, son of deceased Henrietta Tate, filed answer setting up the statute of frauds along with detailed allegations of denial, both general and special. Upon jury trial and return of verdict, a plaintiff's judgment was rendered from which this appeal has been duly prosecuted.

The jury answers in effect were: (1) That on or about April 1940, Henrietta Tate orally gave to Mattie Young Mitchell her full title and interest to the property in question; (2) that said Mattie Mitchell, relying upon said gift, made permanent and valuable improvements on the property during lifetime of Henrietta Tate and with her knowledge and consent; (3) that, relying on such gift, plaintiff shortly thereafter entered into possession of said property; (4) value of improvements so made was $250; (5) that pursuant to such gift, Mattie Mitchell took exclusive possession prior to death of Henrietta Tate.

Appellant's points (fourteen in number) first complain of the court's refusal to withdraw the case from the jury at close of testimony and render a defendant's verdict on the uncontroverted evidence or the great preponderance thereof; in the alternative, for peremptory instruction, carried forward after jury verdict to motions non obstante and for new trial. Likewise in appropriate points the foregoing issues are challenged as not raised by the testimony; the answers thereto not being supported by evidence sufficient to take "the alleged gift out from under the statute of frauds"; and in particular that issues 2 and 3 erroneously assumed that a gift had been made and that plaintiff, relying thereon, entered into possession of the property.

Common source of title was J. R. Nelson from whom Henrietta Tate purchased the property in 1913, having resided thereon from around 1907 until her death in April 1942. Appellant, son and heir of deceased, is a long-time resident of Quebec, Canada. Appellee moved on the property in April 1940 (according to her), where she lived without interruption or interference until sometime in 1949 when proceedings in forcible entry and detainer were filed against her by defendant Thomas A. Williams.

Henrietta Tate, between 70 and 80 years of age in 1940, appears to have suffered a serious illness in 1937, followed by physical incapacity; requiring constant assistance and attention. On the primary issue (gift of realty) we must view the evidence most favorably from standpoint of the jury verdict and judgment. P. C. Spray, a white man and real estate dealer, was well acquainted with the parties hereto, having lived near Henrietta Tate some three years before her death. He testified to conversations with her, viz.:

"Q. What did Henrietta Tate say, if anything, with reference to why Mattie and her husband moved in there? A. I asked her about buying the place, and she said, no, that she had given it to Mattie to take care of her, was why she was in there.

"Q. Did you have a conversation with Henrietta Tate before Mattie moved in there? A. Yes, sir.

"Q. In that conversation did she say anything about getting somebody to live there? A. She said she was trying to get someone, but seemed like she couldn't. She wanted to give it to someone that would take care of her.

"Q. A few days after Mattie moved in, I believe you said you had a conversation with her, in which she said she had given it to Mattie? A. Yes, sir. * * *

"Q. Did you ever have more than one conversation with Henrietta Tate in which she spoke about having given this property to Mattie? A. Yes, sir. * * *

"Q. About how many, would you say? A. Well, at least half a dozen.

"Q. What did she say at that time, as to who owned it, as to what she had done with it? A. She had given it to Mattie, it was Mattie's.

"Q. Did you ever hear her express herself as to the way Mattie was treating her, was taking care of her, if she was satisfied? A. She said she was, is why she give her the place."

On cross-examination, "Q. What did she tell you then, when you tried to buy it (the place) in 1940? A. She told me she wanted to try to find somebody to take care of her, and if she could she would give it to them.

"Q. So she wouldn't sell it to you? A. That is right.

"Q. Then later on you tried to buy it again, didn't you? A. Yes, sir.

"Q. When did you try to buy it the next time? A. Possibly five or six months after that.

"Q. She wouldn't sell it to you then, would she? A. She said she had given it to Mattie."

On issue of permanent and valuable improvements, he stated:

"Q. Were there any improvements made there by Mattie Mitchell here while Henrietta Tate was living? A. Yes, sir.

"Q. Tell the jury what improvements Mattie made while Henrietta was living? A. The foundation was repaired and the roof was repaired and the house was papered.

"Q. What was the condition of the house at the time Mattie moved in there to take care of the old lady? A. It was in very poor condition and leaking."

Lavenia Royal, called by plaintiff, testified in part: "She (Henrietta Tate) grew poorly where she couldn't handle herself, and she, and Mattie sent me word to come and help her, because she was too heavy, she couldn't handle her, and I went on and helped her, and she told me in the presence of Mattie, 'I am tired of staying here by myself—my folks won't see after me, and I am going to give Mattie this home to stay with me.' * * * She (Henrietta Tate) was all the time telling me, I couldn't

name the time that she didn't tell me that she was giving Mattie the home to see after her. * * *

"Q. How long had Mattie been in possession of that place, since what month? A. You mean Mrs. Tate's place, what she had give her?

"A. Yes.

"A. Well, Mattie moved there in 1940.

"Q. Who is in possession of it now? A. Well, I would say Mattie, she give it to her. * * *

"Q. Were you a frequent or infrequent visitor at this house from the time that Mattie moved in there in April 1940, until Henrietta Tate's death—did you go there often or not? A. Yes sir, I did.

"Q. Describe what Mattie did with reference to caring for Henrietta Tate at that time? A. You mean what she did?

"A. Yes.

"A. Well, there is no need of me naming it all, she did everything there was to be done,—she washed, she cooked, she feed her, she cleaned her up, she rolled her around where she wanted to go, she helped her up and down, because she was helpless."

On cross-examination, this witness stated:

"Q. Who did she say she wanted to have this property at the time of her death, or after her death? A. She gave it to her while she was living.

"Q. What were the exact words she used? A. She said Mattie was good to her—Mattie was taking care of her, she didn't have no one else to do it, and she could have the home 'I give it to her to take care of me.' * * *

"Q. And she continued to live there until the time of her death, Henrietta lived there? It was her house, Henrietta's home? A. I would say it was Mattie's home, she gave it to her. * * *

"Q. During her lifetime, while Mattie was living there, were any improvements made upon the house? A. There was.

"Q. What improvements were made? A. They worked on the top, put sills under it, and put a porch to it.

"Q. Who made the improvements? A. I don't know the carpenters' names, but I come there at the time they was working on the house. I would stay in the house. I couldn't name the carpenters to you, but I know they were because I seen them."

Appellee Mattie Mitchell testified on issue of improvements:

"Q. What was the condition of that house at the time you moved in? A. It needed jacking up, it needed a foundation, some new sills put in there, and I had it done, and it leaked, the roof leaked, and I had it repaired.

"Q. Were any improvements made while you lived in that house, while you have been living in that house? A. Yes, sir.

"Q. Will you tell the jury what and when they were made? A. I had a new porch put on it, I had it wired, the lights put in there, and I had the water put in, it didn't have any water, they come across Highway 34 and put it over there.

"Q. When were those improvements made? A. The lights and water was put in there after she died, that was in 1944.

"Q. When were the other improvements made? A. While she was living. I had it jacked up in 1940 and in 1941 I had the roof repaired.

"Q. Who paid for that? A. I did.

"Q. To whom did you pay it? A. I paid it to the men that done the work.

"Q. Who did the work? A. It was Mack Washington, a colored fellow. He did all the repairing, and B. Alexander, a Holiness preacher, did the jacking up. I paid Mack Washington $200.00 for the repairing and the work, too.

"Q. Did that include the material? A. Yes, sir.

"Q. Who was the other man? A. B. B. Alexander.

"Q. How much did you pay him? A. I paid him for the sills, I paid him $25.00 for raising it up, and for jacking it up."

She further stated:

"Q. Whose property has that been since 1940? A. It has been mine.

"Q. And you have been claiming it? A. Yes, sir.

"Q. Have you occupied it every year since 1940? A. Yes, sir, I have.

"Q. What use have you made of it? A. I made good use. I stayed there and used it like it was mine. Fenced it in, done around just like you would about your home, or anyone else.

"Q. You have used it as a home? A. Yes, sir."

█ It is well settled that, notwithstanding the requirements of the statute of frauds, a parol gift of real estate will be enforced in equity upon establishment of the fact of (1) a present gift; (2) possession under the gift taken and held by the donee with consent of the donor; and (3) permanent and valuable improvements made on the premises by donee in reliance on the gift, with the knowledge and consent of the donor; Davis v. Douglas, Tex.Com.App., 15 S.W.2d 232; and possession by the donee need not be exclusive; 21 Tex. Jur., Gifts, p. 37; Patterson v. Patterson, Tex.Civ. App., 27 S.W. 837; Lehman v. Barry, Tex. Civ.App., 126 S.W.2d 499; Scott v. Cliett, Tex.Civ.App., 213 S.W.2d 562. The above recitation of testimony, without more, is amply sufficient to raise the issue under discussion, despite evidence elicited by the defendant tending to show that the sale of land was not "in praesenti" and that the claimed expenditures on the property during lifetime of Henrietta Tate were merely in the nature of repairs.

Appellant relied to an extent on a letter written by appellee to him some three days before the death of his mother. It reads: "Mr. T. A. Williams Dear Sir I receive your message am sorry to no your trouble your mother is still alive the doctor say she might lay in this shape three month I cant hardly get any one to help me with her She told me you said if she get some one to stay with her and take care of her until she died you will give them this home so I am writing you can write and let me no while she can talk and know what she is doing her left foot have swollen and bursted and the skin have come off now you no what I have to do she want you to send her one of your pitchure so she can see it she dont Rest day or night she ask me to write you I have Been with her a year going on to years I close looking for ancer." This writing is in no sense conclusive as an admission against interest, foreclosing the issue of gift; and may be viewed as simply her unlettered method of requesting confirmation thereof on part of the son. Similarly as to the testimony of Viola Blakley and Cora Derrick; the former denying in particular plaintiff's claim of having made valuable improvements. Neither professed, however, to have had any knowledge concerning the initial understanding between plaintiff and deceased, under which she moved onto the place.

Appellant testified to an agreement had with Mattie Mitchell after the funeral in 1942 to effect that in consideration of her kindness to his mother she could occupy the home for one year free of charge, but on a rental basis if for a longer time,—to be collected by his daughter who lived in Terrell. On the other hand and contradictory to this, was the testimony of witness Spray who narrated a conversation had with Williams about the same time, wherein the latter expressed himself as glad that Mattie had taken care of his mother, and wanted her to have the place. State and County taxes were paid over the years by Williams, with City tax payments delinquent and otherwise by appellee. There was testimony of increased value of the property by reason of the improvements in question from $1,500 to $2,000.

█ In absence of objections to their form and substance at time of trial, defendant is in no position to complain that issues 2 and 3 of the court's charge assumed the fact of an oral gift and of plaintiff's reliance thereon; Rule 272, Texas Civil Procedure; and the court's instruction was proper, defining "possession" as not necessarily meaning exclusive possession, "but can mean the joint possession of Mattie Young Mitchell and Henrietta Tate." Scott v. Cliett, supra.

All points of error are accordingly overruled and judgment of the trial court is affirmed.

BOND, C. J., not sitting.